JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
CHRISTINA TUSAN (SBN 192203)
ctusan@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pbrandler@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 601-6766 (Office)
(310) 295-2385 (Fax)

*Attorneys for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**STEVE KASPER,** on behalf of himself and all others similarly situated,

Plaintiff,

vs.

**NFHS NETWORK, LLC.**, a Delaware Limited Liability Company,

Defendant.

Case No. 8:24-cv-00383-CJC-ADS

**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**

**(1) Violation of the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.; and***
**(2) Violation of Business & Professions Code §§ 17200 *et seq.* (UCL)**

**DEMAND FOR JURY TRIAL**

Plaintiff Steve Kasper, on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge, or, where applicable, information, belief, and the investigation of counsel:

## INTRODUCTION

1. This case is about Defendant NFHS Network LLC's unlawful disclosure of Plaintiff's and Class Members' private information about their personal video-viewing habits and activities.

2. Federal law recognizes, through the Video Privacy Protection Act (VPPA), that our video-viewing habits are intimately private. The law accordingly requires companies that sell, rent, or offer subscriptions to prerecorded videos to maintain their customers' privacy and forbids, among other things, the knowing disclosure of customers' video choices to any third party without the customers' specific advance written consent.

3. Defendant NFHS Network LLC ("NFHS Network" or "Defendant"), sells subscriptions by which Plaintiff and other Class Members may view prerecorded videos. Plaintiff and other Class Members paid NFHS a subscription fee to enable them to view prerecorded videos and, therefore, are subscribers of the video services offered by Defendant as described in the Video Privacy Protection Act.

4. Despite a clear legal obligation to keep Plaintiff's and other Class Members' video choices private, Defendant chose to affirmatively disclose this information to third parties, including Meta Platforms Inc. ("Meta") (formerly known as Facebook) ("Meta" or "Facebook"), without Plaintiff's or other Class Members' consent.

5. Using pieces of tracking software, including Meta Pixels, NFHS Network purposefully discloses its customers' viewing choices to Meta and other unauthorized third parties, so that NFHS Network may more effectively profit from its users' private data. And, yet, NFHS Network fails to seek the specific consent required for it to lawfully extract and share its users' data with third parties.

6. Instead of complying with the law, NFHS Network sent the titles and/or

identities of the videos that Plaintiff and other Class Members watched on NFHS Network to Meta, alongside unique information allowing members of the public and Meta to easily identify them. NFHS Network lacked Plaintiff's and other Class Members' informed, written consent to do this. Plaintiff accordingly brings this class action on behalf of himself and all others similarly situated to recover actual and statutory damages against NFHS Network for its unlawful conduct.

## PARTIES

7. Plaintiff Steve Kasper is a resident of the city of Irvine, which is located in Orange County, California. In or about January 2020, Kasper signed up for a service that NFHS Network describes as a "subscription" by agreeing to pay monthly in exchange for access to NFHS Network's live events and its library of prerecorded videos. Kasper has viewed and continued to view until December 15, 2023, both live and prerecorded videos on NFHS Network's website – www.nfhsnetwork.com. Throughout the time that Kasper has been a subscriber to Defendant's services, he has had a Facebook account and he has used that account during that same period.

8. Defendant NFHS Network LLC is a Delaware Corporation. On information and belief, Defendant's principal place of business is 2990 Brandywine Road, Suite 300, Atlanta, Georgia 30341.

9. NFHS Network represents itself as "the nation's premier streaming platform for live and on demand high school sports and events" and as "a subscription-based streaming service that allows our members to watch live and on-demand coverage of their school's events, including sports, graduations, news shows, guest speakers, interviews, and award ceremonies."

## JURISDICTION

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy for the Nationwide Class (as defined below) exceeds $5,000,000 exclusive of interest and costs, there are more than 100 members of the putative class, and minimal diversity exists because a significant

portion of putative class members are citizens of a state different from the citizenship of Defendant.

11. This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 since this suit is brought under the laws of the United States, i.e., the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining statutory state law claim as that state law claim is part of the same case or controversy as the federal statutory claim over which the Court has original jurisdiction.

12. This Court has personal jurisdiction over NFHS Network because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in this state. NFHS Network offers and markets its services to California residents, including Plaintiff, and permits customers to subscribe from California to watch live events and prerecorded videos filmed in California.

13. Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### I. NFHS Network Has Provided Video Tape Services Throughout the Class Period

14. NFHS Network operates a streaming video subscription service by which its users can watch live and prerecorded events from "27 different regular season and postseason sports, as well as other high school activities, celebrating the accomplishments of student-athletes, student broadcasters, and high schools across the country."[1]

15. Plaintiff and other Class Members must subscribe to NFHS Network in order to watch prerecorded videos and live-streamed events on www.nfhsnetwork.com. A basic subscription costs $11.99 per month.

---

[1] NFHS NETWORK, *What is the NFHS Network?*, https://playonsubs.zendesk.com/hc/en-us/articles/210092163-What-is-the-NFHS-Network- (last visited, Jan. 14, 2024).

16. Once subscribed to NFHS Network, Plaintiff and other Class Members may select from among hundreds of pre-recorded videos.

17. Thus, Defendant is a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4) because it is engaged in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."

18. And, Plaintiff and other Class Members are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1) because they are "subscriber[s] of goods or services from a video tape service provider."

## II. NFHS Network Unlawfully Disclosed and/or Released Plaintiff's and Class Members' Personally Identifiable Information to Meta

19. Throughout the Class Period, beginning on an unknown date and continuing to the present, Defendant has released or disclosed Plaintiff's and other Class Members' Personally Identifiable Information to Meta using Meta's tracking pixels.

20. Personally Identifiable Information ("PII") is defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

21. As the Federal Trade Commission has stated, companies who use pixels, like the ones used by Defendant in this case, have numerous options to monetize their use of these pixels. According to the FTC:

> "Pixel tracking can be monetized in several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns. The data can be used to target more specific audiences with ads and other marketing messages. Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings."[2]

[2] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (citing M. Eddy. "How Companies Turn Your Data Into Money".

### *A. Meta's Advertising Platform and the Meta Pixel*

22. Meta, which operates Facebook and was called Facebook, Inc. until changing its name in January 2022, is the world's largest social media company and is ranked number 71 on the list of Fortune 500 Companies. Meta reported having 2.04 billion daily active users as of March 2023[3] and reported $116.61 billion in revenue in fiscal year 2022.[4]

23. Meta's current revenue, as well as its revenue when the company was called Facebook, Inc., has been derived almost entirely from selling targeted advertising to Facebook users, users of its family of apps including Instagram, and internet users on non-Facebook sites that integrate Meta marketing source code on their websites. Meta reported in Fiscal Year 2022 that its revenue from advertising was over $113 billion and Meta stated that it "generated substantially all of our revenue from selling advertising placements on our family of apps to marketers."[5] In its 10k filing covering the fiscal year 2018, Facebook similarly admitted that, "We generate substantially all of our revenue from selling advertising placements to marketers."[6]

24. Meta explains that it generates ad revenue by providing advertisers with relevant leads that can be delivered through ad placement in a number of different locations. Meta states that it "provides advertising on its own platforms, such as Facebook and Instagram, as well as through the Facebook Audience Network . . . Ads

---

PC Mag. October 10, 2018. https://www.pcmag.com/news/how-companies-turn-your-data-into-money) (last visited June 13, 2023.)

[3] Meta Reports First Quarter 2023 Results, https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-First-Quarter-2023-Results-2023.pdf

[4] Meta Reports Fourth Quarter and Full Year 2022 Results, 2/1/23, https://s21.q4cdn.com/399680738/files/doc_financials/2022/q4/Meta-12.31.2022-Exhibit-99.1-FINAL.pdf (last visited 6/6/2023).

[5] Meta, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2022, https://www.sec.gov/Archives/edgar/data/1326801/000132680123000013/meta-20221231.htm (last visited June 19, 2022).s

[6] Facebook, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2018. https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm

on our platforms enable marketers to reach people across a range of marketing objectives, such as generating leads or driving awareness. Marketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites."[7]

25. Meta currently, and historically, sells and has sold advertising space by highlighting its ability to target users. In 2019, Facebook stated, "Our ads enable marketers to reach people based on a variety of factors including age, gender, location, interests, and behaviors. Marketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites."[8] Facebook has also boasted in a sales pitch for its digital advertising that its advanced targeting is better than the limited options offered by other platforms because "people on Facebook share their true identities, interests, life events and more."[9]

26. Meta can target users so effectively because it tracks Facebook's users' activity both on and off its site, including through the use of Pixels that companies like Defendant voluntarily add to their site. This allows Meta to draw inferences about users beyond what they explicitly disclose on their Facebook accounts. Meta also tracks non-users across the web through its widespread Internet marketing products and source code.

27. Meta and Facebook collect and have collected vast amounts of personal

---

[7] Meta Platforms, Inc., Annual Report 10-K, p. 7, 70 (Feb. 2, 2023).

[8] Facebook, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2018. https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm

[9] Dissenting Statement of FTC Commissioner Rohit Chopra, In re Facebook, Inc., Commission File No, 1823109, July 24, 2019, https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement_on_facebook_7-24-19.pdf (citing to Your Guide to Digital Advertising, FACEBOOK BUSINESS https://www.facebook.com/business/help/1029863103720320?helpref=page_content (last visited July 22, 2019).
https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement_on_facebook_7-24-19.pdf (citing to Your Guide to Digital Advertising, FACEBOOK BUSINESS https://www.facebook.com/business/help/1029863103720320?helpref=page_content (last visited July 22, 2019).

data for the purpose of identifying individuals like Plaintiffs and Class Members and aggregating their many identifiers—the result of which is the creation of essentially cradle-to-grave profiles of Plaintiffs and Class Members.[10]

28. FTC Commissioner Rohit Chopra addressed the harms that can be caused by sharing information with Facebook when he stated in 2019, "Because behavioral advertising allows advertisers to use mass surveillance as a means to their undisclosed and potentially nefarious ends, Facebook users are exposed to propaganda, manipulation, discrimination, and other harms. . . . Facebook's massive, private, and generally unsupervised network of advertisers has virtually free rein to microtarget its ads based on every aspect of a user's profile and activity. The company's detailed dossiers of private information includes things like a user's location and personal connections, but it also includes the history of everything a user has ever done wherever Facebook is embedded in the digital world."[11]

29. To target people with advertising, Meta must collect their data so that it can learn their personal characteristics and preferences. One way Meta collects people's data is through the Meta Pixel.[12]

30. The "Meta Pixel," which was formerly known as the Facebook Pixel[13], is a snippet of code that companies can integrate into their website, which allows them to track their website users' activities as those users navigate through the website. It can track, for example, each page an individual visits on the website, what buttons the user

---

[10] Dissenting Statement of FTC Commissioner Rohit Chopra, In re Facebook, Inc., Commission File No, 1823109, July 24, 2019 https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement on facebook_7-24-19.pdf

[11] *Id.*

[12] *See* FACEBOOK, *Meta Pixel – What is the Meta Pixel?*, https://www.facebook.com/business/tools/meta-pixel (last visited Jan. 14, 2024).

[13] Facebook first offered its "Facebook Pixel" in 2013.

clicks, as well as specific information she may input into the website.[14]

31. The Meta Pixel is offered to advertisers, like NFHS Network, to integrate into their websites. Once installed on a website, "the [P]ixel will log when someone takes an action on [that] website."[15] As Facebook explains, "[t]he Meta Pixel receives information about the actions, or events, that take place on [an advertiser's] website."[16]

32. Meta offers the Pixel free of charge to sites, including www.NFHSnetwork.com, because, in order to use the Pixel, the sites agree to give Meta their users' data—in other words, in exchange for Meta's help in collecting and analyzing their users' data for targeted advertising, these websites let Meta keep their users' data and use it for any purposes Meta sees fit.

33. When a user accesses a website with a Meta Pixel installed, the Pixel—operating completely in the background, and without users' knowledge or consent—sends a message to Meta containing, at least:

34. HTTP headers – "Anything that is generally present in HTTP headers, a standard web protocol sent between any browser request and any server on the internet. This information may include data like IP addresses, information about the web browser, page location, document, referrer and person using the website";[17]

35. Pixel-specific Data – which "[i]ncludes Pixel ID and the Facebook Cookie";[18] and

36. Button Click Data – which "[i]ncludes any buttons clicked by site visitors,

---

[14] *See* Meta, About Meta Pixel, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited June 6, 2023).

[15] Facebook, About Meta Pixel, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Jan. 18, 2023).

[16] Facebook, About Automatic Events, https://www.facebook.com/business/help/1292598407460746?id=1205376682832142 (last visited Jan. 18, 2023).

[17] Meta, Meta for Developers, Meta Pixel, https://developers.facebook.com/docs/meta-pixel (last visited June 6, 2023).

[18] *Id.*

the labels of those buttons and any pages visited as a result of the button clicks."[19]

37. Meanwhile, Meta's core business model requires that it be able to track users' activity and link it to known facts about those users. To do this, Meta uses common pieces of software called "cookies." A cookie is a small block of data created by a web server while a user is browsing a website and placed on the user's computer or the user's web browser.

38. Any time a user visits a Meta website, cookies are sent to the user's browser by which Meta can subsequently identify that specific user if they return to any Meta website. Anyone who uses Facebook or Instagram—Meta's two most popular social networks—is sent a cookie that will immediately link that user to the user's personal account.

39. Meta uses these cookies to link the information it gathers from the Pixel with Facebook and Instagram accounts. Indeed, Meta tells advertisers that it "relies on Facebook cookies, which enable [Meta] to match your website visitors to their respective Facebook User accounts," and thereby to create precise audiences to target with advertising.

40. Users with Facebook accounts are assigned a "c_user" cookie from Meta. The c-user cookie contains a person's unencrypted Facebook ID. Any person armed with a user's c_user cookie can immediately identify that user's Facebook page by simply typing "www.facebook.com/[Facebook ID]." For example, Meta CEO Mark Zuckerberg's Facebook ID is four and the URL "www.facebook.com/4" will take you to Mark Zuckerberg's Facebook page. The c_user cookie is active while users are logged in to their Facebook accounts.

41. Users with Facebook accounts are also sent cookies called "datr" and "fr" cookies. These cookies allow Meta to identify users when they are not logged in to Facebook, and at least the datr cookie is active for two years after a user was last logged in to Facebook. Although the public cannot necessarily use datr and fr cookie values to

---

[19] *Id.*

identify individual users, Meta immediately can.

42. Facebook and Instagram accounts, unsurprisingly, contain a wealth of personal information about their users, almost always including their names, photographs, and biographical information.

43. Any time Facebook users visit a website with the Pixel installed, then, the website sends Meta a data packet by which the users' activity on the site is immediately personally identifiable.

44. Meanwhile, it is well known in the online-advertising industry that data about customers' video-viewing habits is quite valuable.[20]

### *B. NFHS Network Knowingly Sends Plaintiff's and other Class Members' Personally Identifiable Information to Meta*

45. Starting on a date unknown and continuing to the present, Defendant embedded the Meta Pixel on and throughout its website—www.nfhsnetwork.com—and transmitted Plaintiff's and Class Members' PII, and their personal identifiers, without their consent, to Meta in accordance with the Meta Pixel's configuration.

46. When Plaintiff or another Class Member visited www.nfhsnetwork.com, the Meta Pixel automatically caused the Plaintiff's or the Class Members' personal identifiers, including IP addresses and the c_user, _fr, _datr, and _fbp cookies, to be transmitted to Meta, attached to the fact that the Plaintiff or the Class Member had visited the website and the titles of the webpages the Plaintiff or the Class Member visited.

47. The cookies that were transmitted as a result of the Meta Pixels that Defendant installed on NFHS Network's website conveyed Plaintiff's and Class Members' Facebook IDs (through the c_user cookie) which can be used by Facebook and others to find the user's real name, the specific and unique web browser from which the

[20] *See, e.g.*, PRICE WATERHOUSE COOPERS, *After a boom year in video streaming, what comes next?*, https://www.pwc.com/us/en/services/consulting/library/consumer-intelligence-series/consumer-video-streaming-behavior.html (last accessed July 12, 2023, at 7:55 AM) (encouraging streaming services "to find ways to leverage the massive amounts of data about consumer behaviors and preferences currently generated by streaming services themselves").

customer is sending the communication (_datr cookie), and an encrypted combination of the information contained in those two cookies (fr cookie).

48. When Plaintiff or another Class Member selects a video to watch on the NFHS Network website, he or she is directed to a webpage hosting that specific video. As soon as the page opens, the video begins to play.

49. Unbeknownst to Plaintiffs and other Class Members, the Meta Pixels on the NFHS Network were and are configured to send details of the webpages that the subscriber views on the NFHS Network website, including the identity of the videos viewed by each subscriber on the website.

50. Until at least June 2023, the Meta Pixels on Defendant's website were intentionally configured to send the title of any pre-recorded video watched by Plaintiff and other Class Members and the URL of the page on which the video is hosted on Defendant's website (which, on information and belief, includes a unique numerical identifier for the video on that page), along with Plaintiff's and Class Members' personal identifiers, including IP addresses, Facebook IDs, and the fr, and datr cookies.

51. At some time after June 2023, the Meta Pixels on Defendant's website were reconfigured to no longer send the title of pre-recorded videos watched by Plaintiff and other Class Members, but they continue to send the URL of the page on which the video is hosted on Defendant's website (which, on information and belief, includes a unique numerical identifier for the video on that page), along with Plaintiff's and Class Members' personal identifiers, including IP addresses, Facebook IDs, and the fr, and datr cookies.

## III. Plaintiff's Experience with NFHS Network

52. Steve Kasper first subscribed to NFHS Network in or about January 2020 by signing up for a service that NFHS Network describes as a "subscription" and paying monthly for access to NFHS Network's library of videos. Since he first subscribed to NFHS Network's services, Kasper has watched dozens of pre-recorded videos on NFHS Network's website.

## TOLLING OF THE STATUTES OF LIMITATIONS

53. Each unauthorized transmission of Plaintiff's and Class Members' Personally Identifiable Information by Defendant is a separate unlawful act that triggers anew the relevant statute of limitations.

54. Additionally, any applicable statutes of limitation have been tolled by: (1) the fraudulent concealment doctrine based on Defendant's knowing and active concealment and denial of the facts alleged herein including but not limited to its incorporation of the tracking pixels and devices; and (2) the delayed discovery doctrine, as Plaintiff and Class Members did not and could not reasonably have discovered Defendant's conduct alleged herein until shortly before the filing of this Complaint. Plaintiff and Class Members did not discover and could not reasonably have discovered that Defendant was disclosing and releasing their Personally Identifiable Information in the ways set forth in this Complaint until shortly before the lawsuit was filed in consultation with counsel.

55. The Meta Pixel and other tracking tools on NFHS Network's website were and are entirely invisible to a website visitor.

56. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's unlawful conduct. Defendant's Privacy Policy does not inform Defendant's customers that their PII will be disclosed to Meta as described in this Complaint.

57. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

58. Defendant had exclusive knowledge that NFHS Network's website incorporated the Meta Pixel and the information that pixel was configured to collect and disclose, and yet Defendant failed to disclose to website visitors, including Plaintiffs and Class Members, that by interacting with NFHS Network's website their PII would be disclosed to, released to, or intercepted by Meta.

59. Under the circumstances, Defendant was under a duty to disclose the

nature, significance, and consequences of its collection and treatment of visitor's and customer's PII. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to NFHS Network's customers and other website visitors that NFHS Network has disclosed or released their PII to Meta or any other unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

60. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

## CLASS ACTION ALLEGATIONS

61. Plaintiff brings this action, on behalf of himself and all others similarly situated, as a class action pursuant to Federal Rules of Civil Procedure, Rule 23 ("Rule 23").

62. Pursuant to Rule 23, Plaintiff seeks to represent the following Class (members of which are collectively referred to herein as "Class Members"):

**Nationwide Class:** All persons in the United States who subscribed to NFHS Network and, while having a Facebook account, viewed prerecorded video content on www.nfhsnetwork.com during the time the Meta Pixel was active on www.nfhsnetwork.com.

**California Subclass**: All persons in California who subscribed to NFHS Network and, while having a Facebook account, viewed prerecorded video content on www.nfhsnetwork.com during the time the Meta Pixel was active on www.nfhsnetwork.com.

63. Excluded from the Class are Defendant, its employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiff's counsel.

64. Plaintiff reserves the right to revise or amend the above Class definition and to add additional Subclasses based on the discovery of new information.

65. This action has been brought and may be properly maintained as a class

action under Federal Rule 23 because there is a well-defined community of interest in the litigation, the proposed Class and Subclass are easily ascertainable, and Plaintiff is a proper representative of the Class and Subclass:

66. **<u>Numerosity</u> (Rule 23(a)(1)):** The potential members of the proposed Nationwide Class and California Subclass, as defined and identified herein, are, on information and belief, more than one hundred thousand, and so numerous that joinder of all members of the Class and Subclass is impracticable.

67. **<u>Typicality (Rule 23(a)(3)):</u>** Plaintiff Kasper's claims are typical of the claims of the Nationwide Class and California Subclass. Plaintiff has been a subscriber to NFHS Network since 2020, he used NFHS Network's website to view pre-recorded videos and, as a result, his PII was disclosed to Meta.

68. **<u>Commonality</u>: (Rule 23(a)(2)):** Common questions of fact and law exist as to all members of the Nationwide Class and California Subclass Members and predominate over the questions affecting only individual members of the Class and Subclass. With respect to Nationwide Class Members these common questions include but are not limited to:

69. Whether Defendant is engaged in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials" and, thus, is a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4);

70. Whether Class Members are "subscriber[s] of goods or services from a video tape service provider" and, thus, are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1);

71. Whether Defendant had Meta Pixels embedded on its website that disclosed Class Members' PII to Meta and/or any other unauthorized third party;

72. Whether Class Members' information collected, disclosed, and shared by Defendant with Meta constitutes PII within the meaning of the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*;

73. Whether Defendant obtained "informed, written consent" from Class

Members within the meaning of 18 U.S.C. § 2710(b)(2)(b) and meeting the requirements of that subsection; and,

74. Whether NFHS Network's acts and practices violated the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*.

75. With respect to members of the California Subclass, additional common questions of fact and law also exist, including:

76. Whether Defendant's acts and practices violated Business and Professions Code §§ 17200, *et seq.*;

77. Whether Defendant's acts and practices harmed Plaintiff Kasper and Class Members;

78. Whether Plaintiff and the Class Members are entitled to an injunction and equitable relief, including but not limited to, restitution and disgorgement;

79. Whether Plaintiff and the Class Members are entitled to damages and other monetary relief, and if so, what is the appropriate amount of damages or other monetary relief; and

80. Whether Plaintiff and Class Members are entitled to reasonable attorneys' fees and costs.

81. This class easily satisfies the requirements of Federal Rule of Civil Procedure 23 for the certification of a class action, known respectively as numerosity, commonality, typicality, adequacy, predominance, and superiority. Although ascertainability is not a separate requirement of class actions, this class is in fact easily ascertainable.

82. **Adequacy of Representation** **(Rule 23(a)(4))**: Plaintiff will fairly and adequately protect the interests of the Class and Subclass. Plaintiff's interests do not conflict with those of Class Members, he has no conflict of interest with other Class Members, is not subject to any unique defenses, and has retained competent and experienced counsel that has experience in complex consumer protection class action and cases, as well as sufficient financial and legal resources to prosecute this case on

behalf of the Class. Plaintiff and his counsel have no interest that is in conflict with or otherwise antagonistic to the interests of other Class Members. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclass. Plaintiff and counsel anticipate no difficulty in managing the litigation of this as a class action.

83. **Predominance and Superiority** **(Rule 23(b)(3)):** In addition to satisfying the prerequisites of Rule 23(a), Plaintiff satisfies the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual members of the Class and Subclass, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. Here, common issues predominate because liability can be determined on a class-wide basis even if some individualized damages determination may be required. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by complex legal and factual issues of the case to all parties and the court system. Furthermore, the expense and burden of individual litigation make it impossible for Class and Subclass members to individually redress the wrongs done to them and individual Class Members do not have a significant interest in controlling the prosecution of separate actions. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. If this action is not certified as a class action, it will be impossible as a practical matter for many or most Class Members to bring individual actions to recover money from Defendant, due to the relatively small amounts of such individual recoveries relative to the costs and burdens of litigation. Plaintiff anticipates no difficulty in the management of this action which would preclude its maintenance as a class action.

84. Plaintiff reserves the right to add representatives for the Class and Subclass, provided Defendant is afforded an opportunity to conduct discovery as to

those representatives.

## FIRST CAUSE OF ACTION

***Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq.***

***[On Behalf of Plaintiff and Nationwide Class Members]***

85. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

86. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent . . . of the consumer" and the opportunity to opt out of disclosures. *See generally* 18 U.S.C. § 2710.

87. NFHS Network is "video tape service provider" because it is "engaged in the business, in or affecting interstate commerce, of . . . delivery of prerecorded . . . audiovisual materials." 18 U.S.C. § 2710(a)(4).

88. Plaintiff and Class Members are "consumers" because they are "subscribers" to NFHS Network's services, each having agreed to pay a monthly amount to access NFHS Network's library of live events and pre-recorded videos, a service NFHS Network describes as a "subscription." 18 U.S.C. § 2710(a)(1).

89. NFHS Network discloses "personally identifiable information" of Plaintiff and other Class Members to Meta because NFHS Network sends "information which identifies a person as having requested or obtained specific video materials" from NFHS Network, 18 U.S.C. § 2710(a)(3), specifically the title and/or identity of every video watched alongside information that would allow an ordinary person and the recipients of the information NFHS Network sends to identify the user.

90. NFHS Network does not seek, let alone get, "informed, written consent" from Plaintiff and other Class Members, 18 U.S.C. § 2710(b)(2)(B), and it never provides them the opportunity to withdraw that consent, 18 U.S.C. § 2710(b)(2)(iii).

91. NFHS Network provided PII to Meta knowingly: NFHS Network installed, embedded, and/or otherwise permitted the presence of Meta Pixels on its website and

knew that these pixels and tracking tools would gather and disclose the titles and/or identities of prerecorded videos watched by Plaintiff and Class Members.

92. By knowingly disclosing Plaintiff's and other Class Members' personal viewing content, NFHS Network violated Plaintiff's and other Class Members' statutorily protected right to privacy in their video-viewing habits and activities. *See* 18 U.S.C. § 2710(c).

93. As a result of the above-described violations, NFHS Network is liable to Plaintiff and other Class Members for actual damages in an amount to be determined at trial or, alternatively, for "liquidated damages not less than $2,500 per plaintiff." 18 U.S.C. § 2710(c)(2)(A). Under the Act, NFHS Network is also liable for reasonable attorneys' fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by NFHS Network in the future.

94. Plaintiff, on behalf of himself and the Class, seeks relief as further described below.

**SECOND CAUSE OF ACTION**

***Violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, et seq.***

***[On Behalf of Plaintiff and California Subclass Members]***

95. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

96. The UCL prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice. California Business & Professions Code § 17204 allows "any person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Such a person may bring such an action on behalf of themselves and others similarly situated, who are affected by the unlawful, unfair, or fraudulent business practice or practices.

97. Defendant's acts, omissions, practices, and non-disclosures as alleged

herein constituted unlawful, unfair, and fraudulent business acts and practices within the meaning of Cal. Bus. & Prof. Code § 17200, et seq.

98. Defendant's business acts and practices are unlawful because they violate the Video Privacy Protection Act, 18 U.S.C. § 2701, et seq. as set forth in this complaint, including in more detail in paragraphs 85–94.

99. Defendant's acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. Defendant secretly disclosed, released, and otherwise misused Plaintiff's and other Class Members' video viewing information, with no corresponding benefit to its affected customers and other website visitors. And, because consumers were unaware of Defendant's incorporation of tracking tools into its website and/or that Defendant would disclose and release their video viewing information to unauthorized third parties, they could not have avoided the harm.

100. The UCL also prohibits any "fraudulent business act or practice."

101. Defendant's above-described nondisclosures were false, misleading, and likely to deceive the consuming public in violation of the fraudulent prong of the UCL. Defendant engaged in such fraudulent acts and practices when it: failed to make the above-described nondisclosures; failed to seek consent from Plaintiff and Class Members; disclosed Plaintiff's and Class Members' video viewing practices to Meta without notice or consent; and, made misleading statements including but not limited to its assertions that it would share "Personal Information with third-party business partners and others included in the notice we gave to obtain your consent," and related statements regarding web beacons, pixel tags, and third party advertisers, none of which explained that Plaintiff's and Class Members' Personally Identifiable Information would be disclosed to third parties, including Meta. These statements, non-disclosures, and other acts and practices were false, misleading, and likely to deceive the consuming public in violation of the UCL.

102. Defendant should be required to cease its unfair and/or illegal disclosure of

user data. Defendant reaped unjust profits and revenues in violation of the UCL.

103. Plaintiff and other Class Members also suffered injury in fact as a result of Defendant's acts and practices because they paid more for Defendant's services than they otherwise would have had they known Defendant was disclosing their personal identifiers and video viewing information to Meta in violation of its legal obligations, social norms, own statements on its website, and reasonable consumer expectations.

104. Plaintiff seeks a declaration from the Court that Defendant's conduct alleged herein constitutes a violation of Bus. & Prof. Code §§ 17200 *et seq*. under the unlawful, unfair, and fraudulent prongs of the UCL.

105. Plaintiff also seeks restitution on behalf of himself and Class Members.

106. Plaintiff and other Class Members lack an adequate remedy at law because the ongoing harms from Defendant's collection and disclosure of their information must be addressed by injunctive relief and, due to the ongoing and nature of the harm, the harm cannot be adequately addressed by monetary damages alone.

107. This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiff in relation to Plaintiff's stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiff also seeks the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

108. Plaintiff, on behalf of himself and the Class, seeks relief as further described below.

## PRAYER FOR RELIEF

Plaintiff on behalf of himself and other Class Members prays for judgment against Defendant as follows:

109. An order certifying the Class as requested herein;

110. An order appointing Plaintiff Steve Kasper as Class Representative;

111. An order appointing the undersigned attorneys as Class Counsel;

112. An order awarding Plaintiff and Class Members statutory damages of no less than $2,500 per class member per violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq.;

113. An injunction forbidding Defendant from disclosing information about users' video viewing choices to third parties pursuant to 18 U.S.C. § 2710(c)(2)(D);

114. Pursuant to Business and Professions Code section 17203, an order that Defendant, its successors, agents, representatives, employees, and all persons who act in concert with it be permanently enjoined from committing any acts of unfair competition as defined in Business and Professions Code §§ 17200 *et seq*., including, but not limited to, the acts and practices alleged in this Complaint;

115. Such orders or judgments as may be necessary to prevent the use or employment by Defendant of any practice that constitutes unfair competition, under the authority of Business and Professions Code § 17203;

116. An order restoring to Plaintiff and other Class Members any money and property acquired by Defendant through its wrongful conduct;

117. An award of reasonable attorneys' fees and costs of suit, including costs of investigation;

118. An award of pre- and post-judgment interest as provided by law; and

119. An award of such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

///

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and all other members of the Class hereby demands a jury trial on all issues so triable.

Dated: April 5, 2024

Respectfully submitted,

*/s/ Julian Hammond*
JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
CHRISTINA TUSAN (SBN 192203)
ctusan@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pbrandler@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 807-1666

*Attorneys for Plaintiff and the Putative Class and Subclass*