**NELSON MULLINS RILEY & SCARBOROUGH LLP**
Jahmy S. Graham (SBN 300880)
jahmy.graham@nelsonmullins.com
Michael E. Seager (SBN 354564)
michael.seager@nelsonmullins.com
19191 South Vermont Avenue, Suite 900
Torrance, CA 90502
Telephone: 424.221.7400
Facsimile: 424.221.7499

Benjamin J. Sitter (SBN 273394)
ben.sitter@nelsonmullins.com
Six PPG Place, Suite 700
Pittsburgh, PA 15222
Telephone: (412) 730-4050
Facsimile: (412) 567-9241

Attorneys for Defendant
NFHS NETWORK, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

STEVE KASPER, on behalf of himself and all others similarly situated,

Plaintiff,

vs.

NFHS NETWORK, LLC, a Delaware Limited Liability Company,

Defendant.

Case No. 8:24-cv-00383-CJC-ADS

**DEFENDANT NFHS NETWORK, LLC'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION**

[*Filed concurrently with the Declaration of Andrew Huddle; Declaration of Jahmy S. Graham; and [Proposed] Order*]

Assigned to Hon. Cormac J. Carney

Date: August 19, 2024
Time: 1:30 PM
Courtroom: 9B

Complaint Filed: 02/23/2024
FAC Filed: 04/05/2024
Trial Date: None Set

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 19, 2024 at 1:30 p.m., or as soon thereafter as counsel may be heard in Courtroom 9B of the above-captioned Court, located at 411 West 4th Street, Room 1053, Santa Ana, California, 92701, the Honorable Cormac J. Carney presiding, Defendant NFHS Network, LLC ("NFHS Network") will and hereby does move this Court for an order to compel arbitration. This motion is brought pursuant to of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et, seq*. ("FAA") and well-settled law on the grounds that Plaintiff Steve Kasper's ("Plaintiff") claims against NFHS Network are subject to a binding mandatory arbitration provision and class action and jury waiver when Plaintiff affirmatively agreed to NFHS Network's Terms of Use and continued to visit and use NFHS Network's website and services. Every cause of action in the instant lawsuit falls directly within the scope of the applicable arbitration provision.

The Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Andrew Huddle and accompanying Exhibits filed concurrently herewith, the Declaration of Jahmy S. Graham filed concurrently herewith, the record in this action, and any oral argument permitted by the Court.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on or around April 3 and April 8, 2024. Plaintiff's counsel has advised that Kasper will oppose this Motion and would not consent to arbitration of this matter.

Dated: May 20, 2024

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: *<u>/s/ Jahmy S. Graham</u>*

Jahmy S. Graham
Benjamin J. Sitter
Michael E. Seager

Attorneys for Defendant
NFHS NETWORK, LLC

# TABLE OF CONTENTS

Page(s)


MEMORANDUM OF POINTS AND AUTHORITIES .......... 1

I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 2

A. Kasper's Claims in This Action .......... 2

B. NFHS Network's Terms of Use .......... 3

C. Kasper's Use of NFHS Network's Services and Acceptance of the Terms of Use .......... 9

III. LEGAL STANDARD .......... 14

IV. ARGUMENT .......... 15

A. Kasper Agreed to Arbitrate His Claims Against NFHS Network .......... 16

1. The FAA Governs the Arbitration Agreement. .......... 16

2. Kasper Assented to the Terms of Use. .......... 16

B. The Court Should Enforce the Parties' Agreement to Delegate Questions of Arbitrability to the Arbitrator .......... 21

C. Even if the Court Preferred to Address Arbitrability, the Arbitration Agreement Clearly Encompasses Kasper's Claims .......... 22

V. CONCLUSION .......... 23

# TABLE OF AUTHORITIES

Page(s)

Cases

*Allied-Bruce Terminix Cos. v. Dobson*,
513 U.S. 265 (1995) ........ 16

AT&T Techs., Inc. v. Commc'ns Workers of Am.,
475 U.S. 643 (1986) ........ 22

*Brennen v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) ........ 22

Burris v. Discover Bank,
No. 8:19-cv-1092, 2019 WL 9516076 (C.D. Cal. Sept. 20, 2019) ........ 23

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) ........ 14

*Citizens Bank v. Alafabco, Inc.*,
539 U.S. 52 (2003) ........ 16

*Cook v. Wells Fargo Bank, N.A.*,
No 4:23-cv-240, 2024 WL 1736371 (S.D. Ga. Apr. 23, 2024) ........ 17

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) ........ 15

*Dickey v. Ticketmaster LLC*,
No. 18-cv-9052-GW, 2019 WL 9096443 (C.D. Cal. Mar. 12, 2019) ........ 15

*Duval v. Costco Wholesale Corp.*,
No. 22-cv-2338, 2023 WL 3852694 (N.D. Cal. June 5, 2023) ........ 16

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ........ 15

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995) ........ 17

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) ........ 21

*In re Facebook Biometric Info. Priv. Litig.*,
185 F. Supp. 3d 1155 (N.D. Cal. 2016)........................................................ 19

*Knutson v. Sirius XM Radio Inc.*,
771 F.3d 559 (9th Cir. 2014) ........................................................................ 17

*KPMG LLP v. Cocchi*,
565 U.S. 18 (2011)........................................................................................ 14

*Lifescan, Inc. v. Premier Diabetic Servs., Inc.*,
363 F.3d 1010 (9th Cir. 2004) ..................................................................... 15

*McLellan v. Fitbit, Inc.*,
No. 3:16-cv-00036, 2017 WL 4551484 (N.D. Cal. Oct. 11, 2017)........................ 22

*Mortenson v. Bresnan Commc'ns, LLC*,
722 F.3d 1151 (9th Cir. 2013) ............................................................... 14, 15

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)................................................................................... 14, 22

*Oracle Am., Inc. v. Myriad Grp., A.G.*,
724 F.3d 1069 (9th Cir. 2013) ...................................................................... 22

*Peter v. Doordash, Inc.*,
445 F. Supp. 3d 580 (N.D. Cal. 2020)..................................................... 15, 17

*Peterson v. Lyft, Inc.*,
No. 16-CV-07343-LB, 2018 WL 6047085 (N.D. Cal. Nov. 19, 2018) ................. 18

*Rent-A-Cntr, W., Inc. v. Jackson*,
561 U.S. 63 (2010)........................................................................................ 21

*Saperstein v. Thomas P. Gohagan & Co.*,
476 F. Supp. 3d 965 (N.D. Cal. 2020)........................................................... 14

*Simula, Inc. v. Autoliv, Inc.*,
175 F.3d 716 (9th Cir. 1999) ........................................................................ 14

*Tompkins v. 23andMe, Inc.*,
No. 5:13-CV-05682-LHK, 2014 WL 2903752 (N.D. Cal. June 25, 2014), *aff'd*,
840 F.3d 1016 (9th Cir. 2016) ...................................................................... 18

*United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*,
363 U.S. 574 (1960) ........ 16

*West v. Uber Techs.*,
No. 18-CV-3001-PSG-GJS, 2018 WL 5848903 (C.D. Cal. Sept. 5, 2018) ..... 18, 20

Statutes

18 U.S.C. § 2710 ........ 1, 2

9 U.S.C. § 1 ........ 16

9 U.S.C. § 3 ........ 1

9 U.S.C. § 4 ........ 14, 15

Bus. & Prof. Code § 17200 ........ 1, 2

Cal. Civ. Code § 1550 ........ 17

Ga. Code Ann. § 13-3-1 ........ 17

Defendant NFHS Network, LLC ("NFHS Network" or "Defendant") respectfully moves to compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, *et seq.*

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

### I. INTRODUCTION

Despite having agreed to arbitrate all claims related to his use of NFHS Network's website—and despite having additionally waived his right to a jury trial and class action lawsuit—Plaintiff Steve Kasper ("Kasper") brought this putative class action, in court, against NFHS Network, a joint venture created to provide sports fans with the ability to stream live and on demand high school sports. Kasper claims that NFHS Network unlawfully discloses Kasper's and others' private information about their "personal video-viewing habits and activities" without consent (*see* First Amended Compl. ("FAC") ¶ 1), asserting claims under the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, *et seq.* and California's Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200, *et seq.*[1] on behalf of himself, a nationwide Class, and a California subclass of NFHS Network consumers. (*See* FAC ¶¶ 62–108.)

As a threshold matter, NFHS Network disputes Kasper's claims have any merit—whether on an individual or classwide basis. More importantly at this stage, however, Kasper has brought his claims in the wrong forum. At all times during his various subscriptions to the services offered by NFHS Network, Kasper's repeated subscription initiations and continued use of NFHS Network's services confirmed his agreement to NFHS Network's use of technologies on the website, NFHS Network's Privacy Policy, and NFHS Network's Terms of Use (collectively, the "Terms of Use"), all of which include a binding arbitration clause and a jury and class action lawsuit waiver. (*See* Declaration of Andrew Huddle ("Huddle Decl."), ¶¶ 10-13, Exhs. 1-5.)

[1] The UCL claim is asserted on behalf of the California subclass only. (*See* FAC ¶ 95–108.)

Having repeatedly agreed to arbitrate his claims on an individual basis, Kasper cannot now represent a putative class in this Court. NFHS Network's arbitration agreement and its class action waiver are fully enforceable under the FAA, and this dispute plainly falls within the scope of claims to be arbitrated under that agreement. Accordingly, Kasper's claims must be adjudicated in binding arbitration on an individual basis, not in this Court on a class wide basis. NFHS Network respectfully requests that the Court grant its motion to compel arbitration.

## II. FACTUAL BACKGROUND

### A. Kasper's Claims in This Action

Kasper's allegations relate to his and other putative class members' use of the NFHS Network website, the disclosures on the website, and NFHS Network's offered streaming services. (*See generally*, FAC.) Kasper alleges that NFHS Network unlawfully disclosed his and others' "private information about their personal video-viewing habits and activities" on its website. (FAC ¶ 1.) He alleges that NFHS Network "sells subscriptions" through which consumers "may view prerecorded videos" (*id.* ¶ 3), and that NFHS Network "chose to affirmatively disclose" his viewing habits and activities on its website to third parties, including Meta Platforms Inc. ("Meta"), through "pieces of tracking software, including Metal Pixels," without his or others' consent. (*Id.* ¶¶ 4–5.)

Kasper brings a claim under the Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq.*, for which he seeks to represent all persons in the United States, and specifically California, "who subscribed to NFHS Network and, while having a Facebook account, viewed prerecorded video content on www.nfhsnetwork.com during the time the Meta Pixel was active" on the website. (*Id.* ¶ 62.) Separately, he brings a claim under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, for which he seeks to represent a similarly defined California sub-

class. As further outlined below, however, all of Kasper's claims are subject to binding mandatory arbitration under NFHS Network's Terms of Use.

**B. NFHS Network's Terms of Use**

Every visitor or user of NFHS Network's website, mobile applications, and other services and products (collectively, the "Services"), is subject to a set of contractual terms and conditions called the "NFHS Network Terms of Use." Since before Kasper began using NFHS Network's services in 2016, the most current version of the Terms of Use has always been publicly displayed on the NFHS Network website's Terms of Use page (the "Terms of Use page").[2] (Huddle Decl. ¶8.) Further, a hyperlink to that Terms of Use page is pushed to customers at different stages of a visitor's use of the website or app, as described in more detail below. (*See* Huddle Decl. ¶¶ 8, 15-19, 21, 23.)

The current version of the Terms of Use—which superseded[3] all prior versions—went live on February 14, 2024 (the "2024 Terms of Use"). (Huddle Decl.¶ 13.) As can be seen in the current Terms of Use page, the 2024 Terms of Use contain, in "ALL CAPS" at the top of the page, express notice of the terms' arbitration provision and class action waiver, stating that "This Agreement Contains a Binding Arbitration Agreement and Class Action and Jury Trial Waiver Clauses in the Below Section 'Dispute Resolution' That is Applicable to You and Us."

---

[2] In 2019, NFHS Network launched mobile applications for customers to access its products and services. The Terms of Use are similarly accessible in the NFHS Network mobile applications, for both iOS and Android (the "mobile Terms of Use pages"). (Huddle Decl. ¶ 8.)

[3] All versions of the Terms of Use have stated that NFHS Network may, from time to time, with or without advance notice, change the Terms of Use in its sole and absolute discretion. (*See* Huddle Decl., Exhs. 2-5.) All versions of the Terms of Use have similarly stated that the current version supersedes all prior versions. (*Id.*)

(Huddle Decl., Exh. 5.) The referenced "**DISPUTE RESOLUTION**" section of the




Terms of Use also appears in "ALL CAPS." (*Id.*) Immediately below this section heading, visitors will see the following: "PLEASE READ THIS ARBITRATION AGREEMENT . . . CAREFULLY. IT REQUIRES YOU TO ARBITRATE DISPUTES WITH US AND LIMITS THE MANNER IN WHICH YOU CAN SEEK RELIEF FROM US AND INCLUDES A WAIVER OF CLASS ACTION AND JURY TRIAL." (*Id.*)

The arbitration provision states that the visitor "agree[s] that any dispute, controversy, or claim relating in any way to your access or use of the Service or to any aspect of your relationship with us, will be resolved by binding arbitration, rather than in court, including threshold questions of the arbitrability of such dispute, controversy, or claim" subject to certain, inapplicable exceptions. (*Id.*) Visitors to the website further agree that the parties must first engage in good-faith efforts to resolve disputes prior to the initiation of arbitration. (*Id.*) The 2024 Terms of Use also provide—as they have since 2022—that users "may opt out of this dispute resolution." (*Id.*)

In addition to the detailed terms and conditions surrounding arbitration, the Dispute Resolution section contains several subsections relating to the arbitration agreement in "ALL CAPS" typeface:

- "**ARBITRATION AGREEMENT: CLASS ACTION WAIVER**" ("WE EACH AGREE THAT ANY PROCEEDINGS, WHETHER IN ARBITRATION OR COURT, WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS AND NOT IN A CLASS OR

REPRESENTATIVE ACTION OR AS A MEMBER IN A CLASS, CONSOLIDATED OR REPRESENTATIVE ACTION")

- **"ARBITRATION AGREEMENT: JUDGE OR JURY TRIAL WAIVER"; and**
- **"ARBITRATION AGREEMENT: GOVERNING LAW, VENUE AND JURISDICTION, AND COURT PROCEEDINGS."**

(*See* Huddle Decl., Exh. 5.)

NFHS Network disseminated the revised 2024 Terms of Use to visitors and users, both new and existing, in several ways. First, visitors entering the NFHS Network website are presented with a "cookie banner" notice of NFHS Network's Privacy Policy along with a notice that makes clear that *either* "further use" of the NFHS Network website *or* affirmatively clicking "agree" *both* indicate an acceptance and agreement to both the NFHS Network website's use of technologies and the Privacy Policy and Terms of Use. (*See* Huddle Decl. ¶ 19, Exh. 10.) The Terms of Use and Privacy Policy are also visibly hyperlinked in a contrasting color.

Second, NFHS Network, on the same day the 2024 Terms went live, sent emails to all existing users with registered accounts, including Kasper, notifying users of the change in Terms of Use. The subject of these emails was "Updates to our Privacy Policy and Terms of Use Agreement." (*See* Huddle Decl. ¶ 20, Exh. 11.) The body of the email included multiple hyperlinks to the complete Terms of Use—also in contrasting colors—and the short email flagged that "key changes" included updates to the arbitration provision language. (*Id.*)



NFHS NETWORK

We understand your inbox is busy, but this is important, and we take the protection of your personal information very seriously.
We are updating our Privacy Policy and Terms of Use, effective **February 14, 2024,** to better align with recent changes in privacy laws and our data practices. We are making it easier for you to understand the information we collect, use and share, as well as providing you with more options for how we handle your data.
Below is a quick summary for each policy:
We updated our Privacy Policy and made the following key changes:

- Information regarding your consent to our use of certain tracking technologies and third-party cookies;
- Provided additional information about privacy rights available to users who are residents of certain states.

We updated our Terms of Use and made the following key changes:

- Updated our binding arbitration language.

We encourage you to review the revised Privacy Policy and Terms of Use. By continuing to use our services on or after the last modified date on the policy in question, you agree to our revised Privacy Policy and Terms of Use. Please reach out to Customer Service if you have any questions.
**NOTE: This is a legal notice, which is why you are receiving this even if you have previously opted out of our marketing and promotional emails.**

(*Id.*)

Finally, all visitors to either the website or mobile app who—like Kasper—create an account are required to affirmatively acknowledge their agreement to the Terms of Use. (Huddle Decl., Exh. 12) In order to create an account, the user *must* click a button that reads "Continue and Agree," which is accompanied by a statement that reads: "By clicking 'Continue and Agree,' you agree to our Privacy Policy and Terms of Use, which includes a binding arbitration clause and jury waiver. . . ." (Huddle Decl. ¶¶ 15, 21, Exh. 12.) The phrases "Privacy Policy" and "Terms of Use"



are imbedded hyperlinks in bright, contrasting blue that will take the user to the referenced page. (*Id*., Exh. 12.)

The NFHS Network Terms of Use has seen four iterations during the time period relevant to this action: the terms effective August 2014 (the "2014 Terms of Use"), the terms effective April 2018 (the "2018 Terms of Use"), the terms effective July 2022 (the "2022 Terms of Use"), and the present 2024 Terms of Use. In every iteration, NFHS Network's Terms of Use has included a mandatory arbitration and class action waiver (the "arbitration provision") with important consistencies.

<u>Binding Arbitration and Class Waiver</u>: The Terms of Use have *always* included a binding arbitration provision and a class action waiver clause. The 2024 Terms of Use changed the syntax of the arbitration provision and added descriptive headings and arbitration-related signposts for users. (*Compare* Huddle Decl., Exh. 5 *with, e.g.*, *id*., Exh. 4.) Nevertheless, at all relevant periods, NFHS Network's Terms of Use included a binding arbitration provision. (*Compare* Huddle Decl., Exh. 5 *with, e.g.*, *id*., Exh. 4.) Moreover, the arbitration provision has always included a class action waiver. (Huddle Decl., Exh. 4 ("Claims seeking relief on a class-wide or consolidated basis rather than on an individual basis may be brought exclusively on an individual basis in arbitration and the parties specifically waive any right to bring any claims between themselves in court on a consolidated or class-action basis."); *cf.* Huddle Decl., Exh. 5 ("WE EACH AGREE THAT ANY PROCEEDINGS, WHETHER IN ARBITRATION OR COURT, WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS AND NOT IN A CLASS OR REPRESENTATIVE ACTION OR AS A MEMBER IN A CLASS, CONSOLIDATED OR REPRESENTATIVE ACTION.").)

<u>The Arbitration Provision Covers a Broad Range of Claims</u>: The scope of the arbitration provision also has not changed materially. Prior to 2024, the scope of the NFHS Network arbitration provision was substantially the same for the entire period

of Kasper's use, encompassing "any controversy or claim arising out of or relating to this agreement, the Service, or any alleged breach of this agreement, or any other controversy or claim between the parties." (Huddle Decl. ¶¶ 10-12, Exhs. 1-4; *cf. id.*, Exh. 5 [2024] ("You agree that any dispute, controversy, or claim relating in any way to your access or use of the Service or to any aspect of your relationship with us, will be resolved by binding arbitration, rather than in court . . . .") Under this provision, the parties agreed arbitration would be the "sole[] and "exclusive[]" dispute resolution process. (Huddle Decl., Exh. 4.)

<u>Delegation to Arbitrator</u>: The agreement—either explicitly or through incorporation of the AAA Commercial Arbitration Rules—has always delegated the threshold issue of arbitrability to the arbitrator. (*See e.g.*, Huddle Decl., Exh. 5 [2024] ("You agree that any dispute . . . will be resolved by binding arbitration, rather than in court, including threshold questions of the arbitrability of such dispute . . . ."); Huddle Decl., Exh. 4 ("The parties specifically agree to submit any controversy or claim . . . solely and exclusively to arbitration administered by the American Arbitration Association ('AAA') in accordance with its Commercial Arbitration Rules.").)

<u>Opt-out:</u> Since 2022, the agreement has included an arbitration "opt-out" provision: (Huddle Decl., Exh. 4.) The 2022 opt-out provided a user 30 days to opt-out of the dispute resolution provision by either mailing a notification of such intent to NFHS Network, or submitting such notification by e-mail. (*Id.*) A prominent and clear hyperlink to the correct e-mail address was embedded in the Terms of Use. (*Id.*) Moreover, the 2022 Terms of Use explicitly clarified that exercising the opt-out right would "not affect these Terms of Use with NFHS Network," and the user would "remain a user." (*Id.*) As described previously, the 2024 Terms continue to provide a 30-day opt-out period. (Huddle Decl., Exh. 5.)

### C. Kasper's Use of NFHS Network's Services and Acceptance of the Terms of Use

As Kasper's FAC alleges, Kasper is a user of NFHS Network's services. Contrary to Kasper's FAC, however, his use of NFHS Network's services dates back not to 2020, but at least to 2016, when Kasper created an account with NFHS Network using the email address [redacted] (the "confirmed account").[4] (Declaration of Jahmy S. Graham ("Graham Decl.") ¶ 4.)

In order to create the confirmed account in 2016, Kasper acknowledged and agreed to the Terms of Use. While NFHS Network has always required users to acknowledge the Terms of Use at account creation, the specific user workflow has varied over the years.[5] (Huddle Decl. ¶¶14-15.) But relevant here, in 2016, when Kasper created his confirmed account, he was required to affirmatively click that he agreed to the Website's terms and conditions before he could complete the

---

[4] As set forth in the Declaration of Jahmy S. Graham ("Graham Decl."), Kasper confirmed that the account associated with the email address [redacted] is his account. Kasper's original Complaint also included allegations regarding a Gmail account. However, the subsequent FAC removed all reference to specific accounts, including the Gmail account, and Kasper has not identified a Gmail account to NFHS Network. (*Compare* Compl. ¶ 7 *with, e.g.*, FAC ¶¶ 3–6.) To the extent Kasper had a Gmail or any other email account, NFHS Network reserves all arguments as to whether the activity associated with those account(s) indicates Kasper's further assent to the Terms of Service and arbitration provision therein.

[5] The user flow for account creation has varied over the years with website redesigns and the addition of and changes to the mobile apps. (*See* Huddle Decl. ¶¶14, 25.) For example, as described previously, any new user creating an account after February 14, 2024 will be required to acknowledge the Terms of Use to complete the account creation by clicking "Continue and Agree," which is prominently displayed, in bold font, and accompanied by a statement with a color-contrasting hyperlink to the full Terms of Use and an explicit disclosure of the arbitration provision. (Huddle Decl. ¶21.) Prior to those updates, however, the user would click "Continue," which was accompanied by a statement, "By clicking 'continue,' you are agreeing to the Terms and Conditions . . . ." Here too there was a prominent and color-contrasting hyperlink to the Terms and Conditions page. (*See* Huddle Decl. ¶¶ 15-17, 23.)

registration process. (Huddle Decl. ¶ 28; Exh. 6.) As can be seen in the image below, the box next to the notice of the Terms of Use was, by default, *unchecked*, requiring the user to manually check the box indicating their assent. Indeed, the account creation could not proceed until Kasper did so as can be seen by the red error message that appeared when a user attempted to continue to the "Next Step" without checking the box to accept:




(Huddle Decl. ¶ 28; Exh. 7.) Thus, to create an account, any user (Kasper included) had to affirmatively click the box confirming their acceptance of the Terms and Conditions. And as can be seen in this image, the interface provided a prominent hyperlink to a new webpage containing the Terms of Use. (*Id*.)

Importantly, Kasper's user data confirms he consented to NFHS Network's Terms of Use prior to creating the confirmed account. (Huddle Decl. ¶ 28.) And at that time and at all times since, the Terms cautioned—in the first "Overview" section of the Terms—that the Terms "are subject to change on occasion, so you should

review these Terms from time to time, as you will be deemed to accept such changes through your continued use of the Service." (Huddle Decl. ¶ 10, Exh. 1; *cf.*, *e.g.*, Huddle Decl. ¶ 13, Exh. 5.)

Since then, Kasper has continued to use NFHS Network's services through multiple periods of lapsed and active paid subscriptions only recently discontinued on May 9, 2024:

| **Subscription Period** | **Initiation Method** |
|---|---|
| 9/2016 - 4/2017 | Web/web mobile subscription |
| 8/2017 - 1/2018 | Web/web mobile subscription |
| 11/2018 - 12/2018 | Web/web mobile subscription |
| 3/2021 - 10/2021 | Web/web mobile subscription |
| 2/25/2023 – 5/9/2024 | Apple subscription |

(Huddle Decl. ¶ 29.) Most recently, Kasper reinitiated a monthly subscription, this time through the iOS app's native interface, which allowed users to subscribe in-app until May 2023.[6] At that time, a user who wished to reactivate a subscription was

[6] Between 2019 (when the NFHS Network mobile apps launched) and May 2023, users could initiate subscriptions in the mobile app directly. (Huddle Decl. ¶¶ 22-23.) To do so, the user would be directed through the app's native iOS subscription flow, rather than being redirected to the Website. After May 2023, mobile app users who wished to initiate a subscription were redirected to the NFHS Network webpage to complete the subscription.

presented with a page that allowed them to pick between a monthly pass and an annual pass:




(Huddle Decl. ¶ 23, Exh. 13-3.) With these options, the interface provides subscription disclosures. (*Id.*) In a standalone paragraph at the end of the disclosures, the last sentence reads, "For more information, see our Terms of Use [hyperlink to the Terms of Use] and Privacy Policy [hyperlink to Privacy Policy]." (*Id.*) Hyperlinks

to both referenced policies appeared in bright blue, bold font against a black backdrop. (*Id.*). Once the user selected a plan—here, Kasper selected a monthly plan—they were transferred to the purchase interface. At the time Kasper initiated his 2023 monthly subscription, the "Terms of Use" hyperlink described above would have linked to the 2022 Terms of Use (*id.*, Exh. 4.), which had gone into effect during the subscription lapse that preceded Kasper's 2023 subscription reactivation.

Moreover, around this time, Kasper was also separately notified that the terms had been updated. In 2022, when NFHS Network launched the 2022 Terms of Use, the Website was updated to push a cookie banner to users titled "Policy Update":




(Huddle Decl. ¶ 17; Exh. 9.) The Terms of Use were flagged as "updated" and a color-contrasting hyperlink to the Terms of Use was provided. (*See id.*) All users—new or returning—would see this banner upon first returning to the website following the launch of the 2022 Terms. (*See id.*) Thus, upon returning to the site after the launch

of the 2022 Terms, Kasper was notified that that Terms of Use had been updated. (Huddle Decl. ¶ 31.) Indeed, Kasper's user history confirms he saw this banner. (*Id*.)

Kasper's last subscription to NFHS Network's paid service—initiated in 2023—remained active until May 9, 2024, at which time his subscription lapsed. Thus, ***when the 2024 Terms were launched, NFHS Network sent Kasper, along with all other account holders, the email notice of the revised Terms of Use described above.***

## III. LEGAL STANDARD

It is well established that "[t]he FAA provides that any arbitration agreement within its scope shall be valid, irrevocable, and enforceable, and permits a party aggrieved by the alleged . . . refusal of another to arbitrate to petition any federal district court for an order compelling arbitration in the manner provided for in the agreement." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (quoting 9 U.S.C. § 4).[7] The United States Supreme Court has explained that the FAA "reflects an emphatic federal policy in favor of arbitral dispute resolution." *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011); *see also Mortenson v. Bresnan Commc'ns, LLC*, 722 F.3d 1151, 1157 (9th Cir. 2013) (The FAA "was created to counter prevalent judicial refusal to enforce arbitration agreements . . . and has been interpreted to embody a liberal federal policy favoring arbitration" (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983))).

The threshold to "demonstrat[e] arbitrability is not high." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999). This is so much so that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Saperstein v. Thomas P. Gohagan & Co.*, 476 F. Supp. 3d 965, 972 (N.D. Cal. 2020) (quoting *Moses H.*

[7] All internal quotation marks, citations, brackets, and deletions are omitted unless otherwise indicated.

*Cone Mem'l Hosp.*, 460 U.S. at 24–25). The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985); 9 U.S.C § 4; *see also, e.g., Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 506 (2018).

Thus, a party seeking arbitration need only prove the existence of an agreement to arbitrate by a preponderance of the evidence. *E.g., Peter v. Doordash, Inc.*, 445 F. Supp. 3d 580, 586 (N.D. Cal. 2020). Meanwhile, as "arbitration is favored, those parties challenging the enforceability of an arbitration agreement bear the burden of proving that the provision in unenforceable." *Mortenson*, 722 F.3d at 1157. When deciding a motion to compel arbitration, a court "may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party." *Dickey v. Ticketmaster LLC*, No. 18-cv-9052-GW, 2019 WL 9096443, at *3 (C.D. Cal. Mar. 12, 2019) (citations omitted).

## IV. ARGUMENT

The FAA governs the parties' arbitration agreement here. The FAA imposes a heavy burden on a party seeking to avoid an arbitration agreement. In assessing whether to grant a motion to compel arbitration, the Court must generally evaluate two key issues: (1) whether a valid arbitration agreement exists; and (2) whether the agreement encompasses the dispute at issue. *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 20g04). Once a court determines that the parties entered into an agreement to arbitrate, however, the court will enforce any further agreement to arbitrate these two arbitrability inquiries.

Here, Kasper agreed to arbitrate his claims because he assented to NFHS Network's Terms of Use. He also agreed to delegate threshold issues of arbitrability to the arbitrator. Respectfully, the Court should enforce the arbitration agreement, and should thus grant NFHS Network's Motion to Compel Arbitration.

**A. Kasper Agreed to Arbitrate His Claims Against NFHS Network.**

**1. The FAA Governs the Arbitration Agreement.**

The FAA governs NFHS Network's arbitration agreement because the underlying contract involves a transaction affecting interstate commerce.[8] *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273-74, 281 (1995) (the FAA applies to contracts evidencing a transaction "affecting commerce").To establish that the FAA applies to a contract, a party need not "show[] any specific effect upon interstate commerce," as long as "in the aggregate the economic activity in question would represent a general practice subject to federal control." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56-57 (2003). The Terms of Use—and Kasper's assent thereto—relate to his subscription to services on NFHS Network's website that permits access to NFHS Network's live events and library of prerecorded videos available on NFHS Network's website and mobile applications. (*E.g.*, FAC ¶¶ 14–15; Huddle Decl., Exh. 5 ("The following Terms of Use . . . set forth the terms and conditions that apply to use of the NFHS Network website . . . mobile application(s) . . . and other applicable services or products . . . .") Courts regularly find that the FAA applies where, as here, an agreement involves transactions and communications on the internet. *E.g.*, *Duval v. Costco Wholesale Corp.*, No. 22-cv-2338, 2023 WL 3852694, at *2 (N.D. Cal. June 5, 2023) (collecting cases).

**2. Kasper Assented to the Terms of Use.**

While the FAA governs the arbitration agreement, whether the parties formed an agreement to arbitrate is "a matter of contract." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). The moving party's burden is light in this regard. NFHS Network need only show, by a preponderance of the

[8] NFHS Network also notes that, prior to the 2024 Terms of Use, each iteration of the Terms of Use expressly stated that the provision fell under the FAA: "The validity of this arbitration clause is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq." (Huddle Decl., Exhs. 1-4.)

evidence, that an agreement to arbitrate exists. *Peter*, 445 F. Supp. 3d at 586. To make this determination, courts "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

As for which state's laws apply, Kasper is a California resident who invokes California law in his operative complaint (*e.g.*, FAC ¶ 7, 95–108), while NFHS Network's principal place of business is in Georgia and the Terms of Use contain a Georgia choice-of-law provision. (*E.g.*, Huddle Decl. ¶ 5, Exhs. 1-5.) The Court need not necessarily resolve at this stage which state's substantive law applies to this dispute because California and Georgia law do not conflict on contract formation. *Compare* Cal. Civ. Code § 1550 (a valid contract under California law exists when (1) the parties are capable of contracting, and there is (2) a lawful object, (3) mutual consent; and (4) sufficient cause or consideration) *with* Ga. Code Ann. § 13-3-1 (a valid contract under Georgia law exists when (1) the parties are able to contract, (2) there is consideration, (3) the parties assent to the terms of the contract, and (4) there is subject matter upon which the contract can operate).

Under both states' applicable law, the crucial inquiry is whether there was a manifestation of mutual assent to the Terms of Use. (*E.g.*, *Peter*, 445 F. Supp. 3d at 585; *see also Cook v. Wells Fargo Bank, N.A.*, No 4:23-cv-240, 2024 WL 1736371, at *4 (S.D. Ga. Apr. 23, 2024).) Assent requires notice of the terms and some outward or objective indication of assent. *Cook*, 2024 WL 1736371, at *4; *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565-66 (9th Cir. 2014) (applying California law).

Kasper's own allegations confirm that he voluntarily entered into a subscription agreement with NFHS Network by "agreeing to pay monthly in exchange for access to NFHS Network's live events and its library of prerecorded videos." (FAC ¶ 7.) Acceptance of the Terms of Use is a requirement for using and subscribing to the

NFHS Network's services. Indeed, Kasper's account and subscription history confirm this.

When Kasper created his account, he confirmed his acceptance of the Terms of Use. Specifically, he was required to ***affirmatively*** click a box next to a statement indicating that he ***agreed to the website's Terms of Use*** to complete the registration process. (Huddle Decl. ¶ 28, *id*. Exh. 6.) The interface included a prominent hyperlink which took the user to those Terms of Use. (Huddle Decl. ¶ 15;.) And a user attempting to proceed past this page without the Terms would receive an error message in bright red font that read, "You must accept the terms and conditions to complete the form[.]" (Huddle Decl. ¶ 15, Exh. 7.) Kasper's own user data further confirms he consented to NFHS Network's Terms of Use prior to creating the confirmed account. (Huddle Decl. ¶ 28.)

In sum, Kasper manifested assent to the Terms of Use both by affirmatively clicking a box to confirm his assent and, separately, by continuing to use NFHS Network's services. Courts routinely enforce agreements formed under such circumstances, given the clear, conspicuous notice to the user of both the existence of the terms and the fact that clicking "agree" and/or continuing to use the service would unambiguously manifest assent. *E.g.*, *Peterson v. Lyft, Inc.*, No. 16-CV-07343-LB, 2018 WL 6047085, at *2 (N.D. Cal. Nov. 19, 2018) (finding that the arbitration agreement is enforceable where a plaintiff's "clicking of the 'I accept' button rendered Lyft's Terms of Service a binding contract"); *Tompkins v. 23andMe, Inc.*, No. 5:13-CV-05682-LHK, 2014 WL 2903752, at *8 (N.D. Cal. June 25, 2014), *aff'd*, 840 F.3d 1016 (9th Cir. 2016) (holding that contract has been formed when the plaintiff "clicked a box or button that appeared near a hyperlink to the [contract] to indicate acceptance of the [contract]"); *West v. Uber Techs.*, No. 18-CV-3001-PSG-GJS, 2018 WL 5848903, at *5 (C.D. Cal. Sept. 5, 2018) ("A reasonably prudent smartphone user would understand that the Terms were connected to the creation of

a user account when notice of the Terms of Service is provided simultaneously to enrollment”).

Moreover, Kasper has manifested assent to subsequent versions of the Terms of Use through numerous subscription renewals and intermittent yet continuing use of NFHS Network’s services and further acknowledgment of updates to the Terms of Use. Courts will enforce updates to terms of use when notice of the updates is provided to the user and the user thereafter continues to use the service. *E.g.*, *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016) (“[I]ndividualized notice in combination with a user’s continued use is enough for notice and assent.”).

Since creating his account in 2016, Kasper has continued to use NFHS Network’s services through multiple periods of lapsed and active paid subscriptions continuing to as recently as May 9, 2024. (Huddle Decl. ¶ 29.) Most recently, in February 2023, Kasper reactivated his monthly subscription, this time through the iOS native interface that was available prior to May 2023. (*Id.* ¶¶ 29, 32.) The process for doing so involved navigating to a page where the user was presented with a page that allowed them to pick between a monthly pass and an annual pass. (Huddle Decl. ¶ 23, Exh. 13-3.). With these options, the interface provided subscription disclosures, and in a standalone paragraph at the end of the disclosures, the last sentence read, “For more information, see our Terms of Use [hyperlink to the Terms of Use] and Privacy Policy [hyperlink to Privacy Policy.” (*Id.*) The two referenced policies were hyperlinks that appear in bright blue, bold font against a black backdrop. (*Id.*). Once the user selected a plan—here, Kasper selected a monthly plan—they would be navigated to the purchase interface. At the time Kasper initiated his 2023 monthly subscription, the “Terms of Use” hyperlink described above would have linked to the 2022 Terms of Use, which had gone into effect during the subscription lapse that preceded Kasper’s 2023 subscription reactivation. (Huddle Decl. ¶ 29; *id*, Exh. 4.)

Moreover, around this time, Kasper was also separately notified that the Terms of Use had been updated. In 2022, when NFHS Network launched 2022 Terms of Use, the Website was updated to push a cookie banner to users titled "Policy Update:" (Huddle Decl. ¶ 17; Exh. 9.) The Terms of Use were flagged as "updated" and a color-contrasting hyperlink to the Terms of Use was provided. (Huddle Decl.) All users—new or returning like Kasper—would see this banner upon first returning to the website following the launch of the 2022 Terms. (Huddle Decl. ¶ 17.) Thus Kasper, upon returning to the site after the launch of the 2022 Terms, was notified that that Terms of Use had been updated. (Huddle Decl. ¶ 31.) Importantly, Kasper's user history confirms he saw this banner. (*Id*.) Kasper also kept his subscription and account active thereafter. (Huddle Decl. ¶ 29.)

Indeed, this last subscription to NFHS Network's paid service—initiated in 2023—continued to renew monthly until May 9, 2024. Thus, when the 2024 Terms were launched, NFHS Network sent an email providing notice of the revised Terms of Use individually to Kasper along with all other account holders. (Huddle Decl. ¶ 33.) That email notified Kasper and other users of the 2024 updates, expressly flagging the revised arbitration terms. *Cf., e.g., West v. Uber Techs.*, No. 18-cv-3001, 2018 WL 5848903, at *5 (C.D. Cal. Sept. 5, 2018). Despite this, Kasper's subscription continued to remain active thereafter on a month-to-month basis, and even after having filed the instant suit on February 23, 2024—less than 10 days after he was provided notice of updated Terms of Use with an updated arbitration provision. (*See* Huddle Decl. ¶ 32.) Moreover, and in conjunction with the individual email sent to Kasper and all users, all new and returning Website visitors are further notified of the update when they land on the Website through a new cookie banner that makes clear that *either* "further use" of the NFHS Network website *or* affirmatively clicking "agree" *both* indicate an acceptance and agreement to both the NFHS Network website's use of technologies and the privacy policy and Terms of Use. (*See* Huddle

Decl. ¶ 19.) Here, too, the Terms of Use and Privacy Policy are also visibly hyperlinked in a contrasting color.

In short, the parties have a valid agreement to arbitrate that should be enforced.

**B. The Court Should Enforce the Parties' Agreement to Delegate Questions of Arbitrability to the Arbitrator.**

The parties agreed that arbitrability determinations should be left to the arbitrator and the Court should enforce that agreement. Parties to an arbitration agreement "can agree to arbitrate 'gateway' questions of arbitrability." *Rent-A-Cntr, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration" can enforce. (*Id.* at 70.) Once the court finds that the parties delegated arbitrability determination to the arbitrator, it may not override that agreement, even if the party opposing arbitration claims the movant's arbitration rights are "wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68-69 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue").

Here, the 2024 Terms of Use clearly and unmistakably provide that "any dispute, controversy, or claim relating in any way to your access or use of the Service or to any aspect of your relationship with us, will be resolved by binding arbitration, rather than in court, including threshold questions of the arbitrability of such dispute, controversy or claim . . . ." (Huddle Decl., Exh. 5.)

Moreover, all prior versions of the Terms of Use also delegated issues of arbitrability to the arbitrator by stating that disputes would be governed by the AAA rules. (Huddle Decl., Exhs. 1-4.) Specifically, they provided that the "parties specifically agree to submit any controversy or claim . . . solely and exclusively to arbitration administered by the American Arbitration Association ('AAA') in

accordance with its Commercial Arbitration Rules.") (*Id.*) The Ninth Circuit, like "[v]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Oracle Am., Inc. v. Myriad Grp., A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013); *Brennen v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *see also, e.g.*, *McLellan v. Fitbit, Inc.*, No. 3:16-cv-00036, 2017 WL 4551484, at *2 (N.D. Cal. Oct. 11, 2017).

**C. Even if the Court Preferred to Address Arbitrability, the Arbitration Agreement Clearly Encompasses Kasper's Claims.**

Once a court finds that an agreement to arbitrate exists, the "presumption of arbitrability" under effected by the FAA mandates that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986); *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25.

Here, the arbitration provision in the Terms of Use is valid, especially broadly written, and directly applies to Kasper's claims. The 2024 Terms of Use state that the agreement to arbitrate extends to "any dispute, controversy, or claim relating in any way to your access or use of the Service or to any aspect of your relationship with" NFHS Network,[9] and every prior version of the agreement similarly covered "any controversy or claim arising out of or relating to this agreement, the Service, or any alleged breach of this agreement, or any other controversy or claim between the parties." (Huddle Decl., Exhs. 1-5.) Kasper's VPPA and UCL claims are both premised on purported unlawful disclosure of his and others' viewing activity on NFHS Network's website. Plainly, these claims "relat[e]" to Kasper's use of NFHS

[9] The 2024 Terms of Use make two express exclusions, neither of which is applicable here: small claims and claims for injunctive or equitable relief related to intellectual property infringement or other misuse of intellectual property rights. (Huddle Decl., Exh. 5.)

Network's services and Kasper's "relationship" with NFHS Network, and they therefore fall within the arbitration provision's ambit. *Cf., e.g., Burris v. Discover Bank*, No. 8:19-cv-1092, 2019 WL 9516076, at *3 (C.D. Cal. Sept. 20, 2019) (finding "especially broad" language in an arbitration provision addressed to disputes "arising out of or relating to" an account "or any other dispute between" the parties to be enforceable).

## V. CONCLUSION

For the foregoing reasons, NFHS Network respectfully requests that the Court grant its Motion to Compel Arbitration and exercise its discretion to refer these proceedings to arbitration.

Dated: May 20, 2024

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: */s/ Jahmy S. Graham*
Jahmy S. Graham
Benjamin J. Sitter
Michael E. Seager

Attorneys for Defendant
NFHS NETWORK, LLC

**CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 11-6.2, the undersigned, counsel of record for Defendant NFHS Network, LLC, certifies that this brief contains 6,336 words, which complies with the word limit under L.R. 11-6.1.

Dated this 20th day of May, 2024.

By: */s/ Jahmy S. Graham*
Jahmy S. Graham

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and I served a copy of the foregoing pleading on all counsel for all parties, via the CM/ECF system and/or mailing same by United States Mail, properly addressed, and first class postage prepaid, to all counsel of record in this matter.

*/s/ Jahmy S. Graham*
Jahmy S. Graham